UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SHALECSHA MOORE,

|                          |                                     |
|--------------------------|-------------------------------------|
| Plaintiff,               | Civil Action No. 13-11831           |
|                          | Honorable Patrick J. Duggan         |
| v.                       | Magistrate Judge David R. Grand     |

MILLICENT WARREN, JODI
DeANGELO, DR. PEI, R.N.
OZOR, and SUBRINA AIKENS,

                          Defendants.
_____/

**REPORT AND RECOMMENDATION TO GRANT IN PART AND DENY IN
PART THE MDOC DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [8]**

**and**

**ORDER CONDITIONALLY ALLOWING LIMITED AMENDED COMPLAINT**

Before the Court is the Motion for Summary Judgment filed on June 28, 2013 by four

defendants, all of whom are employed by the Michigan Department of Corrections ("MDOC"):

Millicent Warren, Jodi DeAngelo, Catherine Ozor, and Subrina Aiken (collectively the "MDOC

Defendants"). (Doc. #8). *Pro se* Plaintiff Shalecsha Moore ("Moore"), an incarcerated person,

submitted a response to this motion on August 21, 2013. (Doc. #16). Defendants did not file a

reply. An Order of Reference was entered on July 1, 2013, referring all pretrial matters to the

undersigned pursuant to 28 U.S.C. §636(b). (Doc. #10).

Generally, the Court will not hold a hearing on a motion in a civil case in which a party is

in custody. *See* L.R. 7.1(f). Here, the Court finds that the facts and legal issues are adequately

presented in the briefs and on the record, and it declines to order a hearing at this time.

## I.    RECOMMENDATION

For the reasons set forth below, **IT IS RECOMMENDED** that the MDOC Defendants' Motion for Summary Judgment [8] be **GRANTED** as to Defendants Warren, Ozor and Aiken, and **DENIED WITHOUT PREJUDICE** as to Defendant DeAngelo.

## II.    REPORT

### A.    Background

Moore is a State of Michigan prisoner who is confined at the Women's Huron Valley Correctional Facility ("WHV") in Ypsilanti, Michigan.  (Doc. #1 at 3).  Moore brings this civil rights action pursuant to 42 U.S.C. §1983 against MDOC employees Millicent Warren, Jodi DeAngelo, Catherine Ozor, and Subrina Aiken.[1]  Generally speaking, Moore alleges that while being held in segregation, she experienced severe and ongoing pain in her pelvic and abdominal areas, which she claims was not timely and properly treated despite her requests for help.

Defendant Ozor was, at all relevant times, a Registered Nurse at WHV.  (Doc. #8 at Ex. 3, ¶1).  Moore alleges in her complaint that, on August 27, 2011, September 19, 2011, and September 21, 2011, while in prison administrative segregation, she sent "kites" to prison healthcare indicating that she was suffering from pelvic and abdominal pain, and requesting an appointment with a doctor.  (Doc. #1 at ¶¶2, 4, 6).  Moore further alleges that, on September 22, 2011, she received a kite response from Defendant Ozor, indicating that she would be scheduled for a visit with a physician on approximately September 23, 2011.  (*Id.* at ¶7).  According to Ozor, Moore was only tentatively placed on a list to see a physician on that date, because "prisoners are triaged based on the level of emergent needs received."  (Doc. #8 at Ex. 3, ¶3).  Apparently Moore was not seen by a physician on September 23, 2011 (Doc. #1 at ¶8); however,

---

[1] Also named as a defendant in this action is "Dr. Pei," an employee of Prison Health Services. Dr. Pei filed an answer to Moore's complaint on September 27, 2013.  (Doc. #20).

she was seen by Dr. Pei just five days later, on September 28, 2011, and prescribed an antibiotic medication.[2] (Doc. #8 at Ex. 3, ¶4). In her complaint, Moore asserts that she filed a grievance against Ozor because she was not seen by a physician on September 23, 2011.[3] (Doc. #1 at ¶10). Moore makes no further allegations in her complaint against Ozor.

At all relevant times, Defendants Warren and DeAngelo were the Warden and Deputy Warden, respectively, at WHV. (Doc. #8 at Ex. 1, ¶1; Ex. 2, ¶1). In her complaint, Moore does not allege that Warren or DeAngelo denied her requests for medical care; rather, Moore alleges that she named them in grievances she filed regarding this issue in the hope that they would rectify the situation. (Doc. #1 at ¶¶10, 11, 15, 29). For example, Moore alleges in her complaint that, on September 25, 2011, she filed grievances against Defendants Ozor, Pei, DeAngelo, and Warren for denying her request to be seen by a medical service provider ("MSP") while in prison segregation.[4] (Id. at ¶10). Moore explains that the purpose of filing these grievances was "to

---

[2] Apparently, Dr. Pei had previously examined Moore on August 16, 2011. At that time, Dr. Pei had diagnosed Moore with bacterial vaginitis and had prescribed an antibiotic. (Doc. #1 at ¶27; Doc. #8 at Ex. 3, ¶4). On November 1, 2011, Moore was also seen by Dr. Azimi, who completed a vaginal culture and prescribed another antibiotic. (Doc. #8 at Ex. 3, ¶6).

[3] In Michigan's correctional facilities, prisoner grievances are governed by MDOC Policy Directive 03.02.130, entitled "Prisoner/Parolee Grievances". *See* http://www.michigan.gov/documents/corrections/03_02_130_200872_7.pdf (the "Policy"). If the prisoner cannot resolve her dispute with the staff member involved, she has five business days to file a Step I grievance. (Id. at ¶¶P, V). If the prisoner is dissatisfied with the Step I response, she may submit a Step II appeal within ten business days after receipt of the Step I response, or if no timely response is received, within ten business days of the date the response was due. (Id. at ¶BB). If the grievant is dissatisfied with, or does not receive, a Step II response, she has ten business days within which to file a final appeal at Step III. (Id. at ¶FF).

[4] Although Moore attaches to her complaint what appears to be a draft grievance referencing Warren and DeAngelo dated September 25, 2011 (Doc. #1 at 25), there is no indication that she ever actually sent this grievance, or that it was ever received by prison administration at Step I. Moore also attaches to her complaint a virtually identical grievance (Id. at 53), also dated September 25, 2011, but which apparently was received some time in September 2012 (as it was assigned Grievance No. WHV-2012-09-4451-28B and rejected as vague on September 18, 2012). (Id. at 53-54). Close examination of these grievances, however, reveals that they are not, in fact, identical: for instance, the draft grievance refers to "Warden Millicent Warren," while

bring the matter to the attention of the medical staff and responsible [sic] for failing to schedule plaintiff to be seen by MSP." (*Id.*). The only other allegation in Moore's complaint pertaining to Defendants Warren and DeAngelo is that they failed "to take displinary [sic] or other action to curb the known pattern of inadequate medical care to segregation prisoners…." (*Id.* at ¶32).

At all relevant times, Defendant Subrina Aiken was employed by MDOC as a Registered Nurse at Southern Regional Health Care Administration in Jackson, Michigan. (Doc. #8 at Ex. 4, ¶1). Aiken's only alleged involvement in this case was in responding to the following grievances Moore filed (*Id.* at Ex. 4, ¶¶3-4):

- Grievance No. WHV-2011-11-5111-28E: In this grievance, Moore asserted that Defendant Ozor had told her she would see a physician on September 23, 2011, but such a visit did not occur. (Doc. #1 at 23). This grievance, which was dated September 25, 2011, was not received by the MDOC until November 28, 2011. (*Id.*). Thus, it was denied at Step I of the grievance process as untimely. (Doc. #8-5 at 5). Nevertheless, Defendant Aiken conducted a Step II investigation into Moore's allegations; she determined that Moore had kited healthcare on September 21, 2011, and was seen by a physician on September 28, 2011. (*Id.*). Aiken reported the results of her investigation in a written Step II response to this grievance, dated March 8, 2012. (*Id.*).

- Grievance No. WHV-2011-11-5110-28E: In this grievance, Moore asserted that the "segregation nurse" (presumably Defendant Ozor) was denying her requests to see a doctor because she was in segregation. (Doc. #1 at 32). This grievance, which was dated October 16, 2011, was received by the MDOC on November 28, 2011. (*Id.*). Thus, it was denied at Step I of the grievance process as untimely. (Doc. #8-5 at 7). Again, despite the grievance's alleged untimeliness, Defendant Aiken conducted a Step II investigation into Moore's allegations; she determined that Moore was monitored while in segregation, and nursing rounds were completed daily. (*Id.*). In addition, Aiken noted that Moore had kited healthcare on October 12, 2011, was scheduled for a "sick call," and was seen by a physician on November 1, 2011. (*Id.*). Aiken reported the results of her investigation in a written Step II response to this grievance, dated March 9, 2012. (*Id.*).

Moore makes no other allegations regarding Aiken's involvement in the case.

To summarize, Moore alleges that the MDOC Defendants' actions violated her Eighth

the grievance received by the MDOC refers to "Warden M. Warren." (*Id.* at 25, 53). While the issue may bear on whether Moore properly exhausted her grievance(s), neither party briefed that issue, and the Court will not address it further.

Amendment right to be free from cruel and unusual punishment and were deliberately indifferent to her serious medical needs. (Doc. #1). Moore sues the MDOC Defendants in their personal and official capacities, seeking $300,000 in compensatory damages for physical and emotional injuries, $160,000 in punitive damages, and declaratory and injunctive relief. (*Id.* at 13-14).

### B.    Standard of Review

Pursuant to Federal Rule of Civil Procedure 56, the Court will grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Pittman v. Cuyahoga County Dep't of Children & Family Servs.*, 640 F.3d 716, 723 (6th Cir. 2011). A fact is material if it might affect the outcome of the case under governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material fact exists, the Court assumes the truth of the non-moving party's evidence and construes all reasonable inferences from that evidence in the light most favorable to the non-moving party. *See Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006).

The party seeking summary judgment bears the initial burden of informing the Court of the basis for its motion, and must identify particular portions of the record that demonstrate the absence of a genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009). "Once the moving party satisfies its burden, 'the burden shifts to the nonmoving party to set forth specific facts showing a triable issue.'" *Wrench LLC v. Taco Bell Corp.,* 256 F.3d 446, 453 (6th Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)). In response to a summary judgment motion, the opposing party may not rest on its pleadings, nor "'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but

5

must make an affirmative showing with proper evidence in order to defeat the motion."
*Alexander*, 576 F.3d at 558 (internal quotations omitted).

## C.    Analysis

In their motion, the MDOC Defendants argue that summary judgment is appropriate for
three reasons:  first, Moore's allegations against Defendants Warren, DeAngelo, and Aiken do
not establish the requisite level of personal involvement necessary for liability under §1983;
second, Moore has failed to establish an Eighth Amendment denial-of-medical-care claim
against Defendant Ozor; and, third, the MDOC Defendants are shielded by qualified immunity.
(Doc. #8).  The Court addresses each argument in turn.

### 1.    The Requisite Level of Personal Involvement
### by Defendants Warren, DeAngelo, and Aiken

The MDOC Defendants first argue that Moore fails to state a claim under §1983 against
Defendants Warren, DeAngelo, and Aiken because she has not "made a clear showing that each
named defendant was personally involved in the activity that forms the basis of the complaint."
(Doc. #8 at 9-10).

#### a.    General Legal Standards

In order to demonstrate liability under §1983, a plaintiff must first establish that each
named defendant acted under color of state law and that her actions violated rights secured by the
Constitution and/or laws of the United States.  *See Baker v. McCollan*, 443 U.S. 137 (1989).  The
plaintiff also must make a clear showing that each named defendant was personally involved in
the activity that forms the basis of the complaint.  *See Rizzo v. Goode*, 423 U.S. 362, 377 (1976);
*Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984).  Moreover, §1983 liability cannot be
premised upon mere allegations of *respondeat superior*, *i.e.*, supervisory liability; rather, a
defendant can only be liable under §1983 if the plaintiff shows that she personally participated

6

in, or otherwise authorized, approved, or knowingly acquiesced in, the allegedly unconstitutional conduct. *See Monell v. New York City Dept. of Soc. Servs.*, 436 U.S. 658, 691 (1978); *Bellamy*, 729 F.2d at 421. A supervisory official's awareness of a complaint of allegedly illegal conduct, and her subsequent failure to take corrective action, is insufficient to trigger §1983 liability. *See Poe v. Haydon*, 853 F.2d 418, 429 (6th Cir. 1988). Furthermore, mere participation in the grievance process, including signing a grievance response, is insufficient to show personal involvement. *See Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999); *Lee v. Michigan Parole Board*, 104 F. App'x 490, 493 (6th Cir. 2003). Rather, liability under §1983 must be based upon active unconstitutional behavior, not a "mere failure to act." *Shehee*, 199 F.3d at 300.

### b.    Defendant Warren

Defendant Warren is the Warden of WHV. (Doc. #8 at Ex. 1, ¶1). Moore does not allege in her complaint that Warren actually received or denied her requests for medical care. Although Moore did file a grievance against Warren, she admits that she did so not because of her action (or inaction), but only to "bring the matter to [her] attention" in the hope that she would rectify the situation. (Doc. #1 at ¶10). Thus, Moore's grievances – about the care others were providing to her – have no direct connection to Warren. *See* Policy, ¶P ("Prior to submitting a written grievance, the grievant shall attempt to resolve the issue ***with the staff member involved*** within two business days after becoming aware of a grievable issue…") (emphasis added).

Moore's only other allegation against Defendant Warren is that she failed "to take displinary [sic] or other action to curb the known pattern of inadequate medical care to segregation prisoners …." (*Id.* at ¶32).[5] These allegations fail to raise a material question of fact

---

[5] Moore makes similar assertions in her brief in response to the MDOC Defendant's motion. (Doc. #16 at 9-10, 16) ("Warren knew or should have known that staff constantly failed to utilize clinic area in the housing unit for segragation [sic] prisoners with serious medical

as to Warren's liability in this case.  Viewed in the light most favorable to Moore, her allegations

are nothing more than an attempt to improperly impose *respondeat superior* liability on an

individual who did not herself directly participate in the alleged improper care.  *See Shehee*, 199

F.3d at 300 (holding that "§1983 liability must be based on more than respondeat superior, ***or the***

***right to control employees***") (emphasis added) (citing *Hays v. Jefferson County, Ky.*, 668 F.2d

869, 874 (6th Cir.1982)); *Poe*, 853 F.2d at 429 (a plaintiff's "mere claim" that defendants were

aware of the alleged misconduct, but did not then take appropriate action, is insufficient to

impose liability on supervisory personnel under § 1983).

In an effort to overcome this shortcoming, Moore cites *Brandon v. Allen*, 516 F. Supp.

1355 (W.D. Tenn. 1981), *Hill v. Marshall*, 962 F.2d 1209 (6th Cir. 1992), and *Hicks v. Frey*, 992

F.2d 1450 (6th Cir. 1993), for the proposition that, "Officials who set policy, write regulations or

give orders may be liable [under §1983] even if they are not directly involved in enforcing them

against a prisoner."  (Doc. #16 at 14).  But these cases do not change the analysis here because

Moore's argument is based on the faulty fundamental premise that she was unconstitutionally

denied medical care pursuant to a broad facility-wide policy.

In *Brandon*, a police officer with a lengthy history of abusing and harming citizens had

---

needs…thereby creating a 'custom of denying and/or delaying medical care.  Warren had power
and authority to order plaintiff's release to transfer to on-site health care to carry out pelvic
exam. * * * Warren was obligated to make visual rounds in the segragation [sic] department
according to description duties of a prison warden.  Warren failed to take corrective action ….
Warren at least acquiesced in the mistreatment of plaintiff.").  But these types of allegations
show precisely why §1983 liability should not, and cannot, be based on mere *respondeat
superior*.  Essentially, Moore asks Warren, a prison warden, to fulfill a role that is not hers –
doctor.  It is up to the medical staff who treat prisoners to diagnose them and decide their course
of treatment.  If their fulfillment of those duties falls below a constitutionally adequate level,
then the inmate may have a valid §1983 claim against them.  Moore seeks to subvert the entire
process by which those claims ripen and are litigated by essentially requiring a prison warden to
step in and make medical judgments upon receipt of a grievance challenging particular medical
decisions.  Neither the law nor the prisoner grievance system contemplates such a course.

remained employed, and then wrongfully harmed the plaintiff during the course of his duties.  In imposing liability against the Director of Police in his official capacity, the court held that the plaintiff's constitutional injuries "were sustained *as a direct result of municipal policies and customs*" of the Memphis Police Department, including a "code of silence" and "the inherently deficient nature of police administrative procedures involving the discovery of officer misconduct." *Brandon v. Allen*, 645 F. Supp. 1261, 1263, 1269 (W.D. Tenn. 1986) (emphasis added).  Moore's case is not factually analogous to *Brandon* because unlike in that case, Moore did receive medical treatment in various forms, *see* Section C.2*, infra*, thus evidencing the lack of an injury caused by an official policy.

In *Hill*, a prison's Deputy Superintendent of Treatment, Terry Morris, had "referred inmates' complaints of not getting medication to the head nurse, *the very person whom he knew to be wrongly altering and destroying some of the inmates' prescriptions*." *Hill*, 962 F.2d at 1213 (emphasis added).  Noting that one of Morris' specific duties was "reviewing and responding to inmates' complaints about medical needs" and that Morris had "actual knowledge" of the nurse's misdeeds, the Sixth Circuit reasoned that Morris could be liable to Hill *not* because Morris was the Superintendent of Treatment, but rather because, in that role, he "*personally* had a job to do, and he did not do it." *Id.* (emphasis in original).  Here, in contrast, Moore does not allege that Warden Warren was charged with micromanaging the individual delivery of medical services to each and every patient.  The closest she comes is an unsupported assertion in her response brief that Warren "was obligated to make visual rounds in the segragation [sic] department according to description duties of a prison warden…" (Doc. #16 at 16).  But, that is a far cry from saying that Warren knew or should have known that the treatment Moore was receiving was actually constitutionally deficient.

9

Moore's reliance on *Hicks* is also unavailing.  In that case, an inmate attempted to escape prison, fell from a significant height, and became a paraplegic as a result.  After spending many weeks in the hospital healing, Hicks was returned to the prison.  He was then placed in a segregation cell as punishment for his failed escape attempt.  However, the cell could not accommodate Hicks' wheelchair, and, thus, he was bedridden during his entire three-month long detention in that cell.  He developed bed sores and often had to lay in his own waste for hours while waiting for assistance.  The defendant officer in charge of the jail was contemporaneously aware of Hicks' daily complaints about those conditions, yet he did nothing even to investigate.  In upholding the jury's verdict against that officer, the Sixth Circuit wrote:  "In the absence of inquiry or at least some show of concern about Hicks' condition and the problems with that condition, the jury could reasonably have found that [the officer] at least acquiesced in the mistreatment…."  *Id.* at 1457.  That is not the case here, where Warren is not alleged to have witnessed Moore's condition and where it is undisputed that Moore received a variety of medical treatment while in segregation.

As such, Moore's allegations against Warren appear to be an end-run around the law that prevents her from recovering for negligent treatment (if in fact she was treated negligently) by suggesting that Warren, as the Warden, should know precisely what treatment Moore needed and when.  Clearly, however, the law does not impose such a responsibility on her, and she can only be liable to Moore if she was personally involved in an unconstitutional wrong.  Since Moore received a variety of treatment, had her grievances investigated, etc., she has failed to adequately allege an underlying unconstitutional policy which caused her to suffer an injury.  Thus, she has no claim against Warren in her capacity as Warden.  As Moore's allegations do not establish the requisite level of "personal involvement" required to impose §1983 liability against Defendant

Warren, she should be dismissed from this action.

c.      *Defendant Aiken*

Moore's allegations against Defendant Aiken, who was employed not at WHV (where Moore is incarcerated), but at Southern Regional Health Care Administration in Jackson, Michigan, similarly fail to allege the requisite personal involvement.  Moore's complaint makes clear that Aiken is named as a defendant in this case only because she responded to Moore's grievances.  (Doc. #8 at Ex. 4, ¶¶3-4).  Specifically, Moore filed two grievances in 2011 regarding the alleged denial of healthcare while she was in segregation.  After these grievances were denied at Step I, Moore appealed them to Step II, at which point Aiken investigated Moore's allegations and drafted written responses denying her appeals.  (*Id.* at ¶3).  Moore makes no other allegations regarding Aiken's involvement in the case.  Even taking these allegations as true, Aiken is entitled to summary judgment.

The law is clear that Aiken's denial of Moore's Step II grievance appeals does not amount to actionable "personal involvement" under §1983.  *See Shehee*, 199 F.3d at 300; *Lee* 104 F. App'x at 493 ("Moreover, Lee may not base his claim against the individual defendants upon their denial of his administrative grievances.  Section 1983 liability may not be imposed simply because a defendant denied an administrative grievance or failed to act based upon information contained in a grievance.") (citing *Shehee*, 199 F.3d at 300).  Thus, Moore's §1983 claim against Aiken fails, and she should be dismissed from this action.

d.      *Defendant DeAngelo*

The MDOC Defendants also argue that summary judgment is appropriate as to Defendant DeAngelo because Moore failed to allege the requisite level of personal involvement.  (Doc. #8 at 9-10).  It is true that the allegations in Moore's complaint regarding Defendants Warren and

11

DeAngelo are essentially the same.  For example, Moore does not allege in her complaint that either Warren or DeAngelo actually received or denied her requests for medical care.  Rather, she asserts that she filed a grievance against them in order to "bring the matter to [their] attention" and that they failed "to take displinary [sic] or other action to curb the known pattern of inadequate medical care to segregation prisoners …."  (Doc. #1 at ¶¶10, 32).  Looking simply at the allegations in Moore's complaint, then, it would appear that her claim against DeAngelo would fail for the same reasons her claim against Warren fails.  *See* Section C.1.b*, supra.*

In response to the MDOC Defendants' motion, however, Moore makes several additional allegations against DeAngelo.  Specifically, Moore alleges that, while she was in segregation, DeAngelo "made several rounds … where she physically seen [sic] and spoke with plaintiff regarding obgyn [sic] issues.  DeAngelo physically seen [sic] plaintiff lying on the floor several times unable to move due to pain in vagina."  (Doc. #8 at 10).  Later in her response brief, Moore asserts:

> … DeAngelo ignored repeated requests for medical treatment made by plaintiff.  Plaintiff spoke directly to DeAngelo during her "Segragation [sic] visual rounds."  Exact times can be found in "daily log" book for staff.  DeAngelo told plaintiff "she would not be taken out of segragation [sic] for any reason until her time is served."  Plaintiff begged DeAngelo to send her to get pelvic exam done, DeAngelo was able to physically see plaintiff in extreme pain.

(*Id.* at 18).  Although, for the reasons discussed below, these allegations are somewhat suspect, the Court finds that at this early stage of the proceedings they require that Moore be given the opportunity to amend her complaint with respect to Defendant DeAngelo, and that DeAngelo's instant motion for summary judgment motion be denied without prejudice.[6]

---

[6] Moore did not specifically request permission to amend her complaint.  However, given her *pro se* status, as well as Fed. R. Civ. P. 15(a)(2)'s admonition that leave to amend shall be freely granted "when justice so requires," the Court finds it appropriate to allow Moore thirty days within which to amend her complaint to include her allegations regarding Defendant DeAngelo.

As an initial matter, it is worth noting that it was not until the MDOC Defendants moved for summary judgment, arguing that Moore had not alleged the requisite level of personal involvement on the part of Warren, Aiken, or DeAngelo, that Moore first accused DeAngelo of seeing her "lying on the floor … unable to move due to pain in her vagina," and ignoring her "repeated requests for medical treatment." (*Id.* at 10, 18). These allegations were not spelled out in the grievances that Moore drafted and/or filed against DeAngelo (indeed, Moore merely grieved DeAngelo for "failure to oversee and provide adequate medical attention"). (Doc. #1 at 25, 53). Likewise, these allegations were not included in Moore's complaint. It was only when Moore was when facing dismissal of her claim against DeAngelo that she first alleged that DeAngelo personally saw her in "extreme pain" and ignored her requests for medical care.

However, in the face of these new assertions by Moore in her response brief, the MDOC Defendants did not file a reply brief debunking (factually or legally) or otherwise responding to Moore's eleventh-hour allegations.[7] And, despite the fact that Moore referenced "daily log" books that purportedly support her allegations against DeAngelo, the MDOC Defendants did not submit those documents or come forward with any other evidence contradicting Moore's allegations.

While such unsupported allegations made in a response brief might not generally be sufficient to overcome an otherwise properly-supported summary judgment motion, *see Garvey v. Montgomery*, 128 F. App'x 453, 462 n. 6 (6th Cir. 2005), here, no discovery whatsoever has

---

[7] DeAngelo had previously submitted a sworn affidavit in support of the MDOC Defendants' motion for summary judgment, in which she affirmed that, in all relevant respects, she has "no personal knowledge of or involvement in the specific actions which form a basis to Plaintiff's complaint …." (Doc. #8 at Ex. 2, ¶3). Thus, it appears that DeAngelo would deny the allegations set forth in Moore's response brief. Regardless, however, such denials, at least at this stage, without any discovery having taken place, would appear to create an issue of fact as to DeAngelo's personal involvement.

yet been taken (making DeAngelo's arguments more akin to ones at the motion to dismiss stage), and Moore has specifically articulated documents which she claims would help support her factual allegations.  Thus, on the limited record before the Court, and taking Moore's factual allegations as true (as it must do at both the motion to dismiss and motion for summary judgment stages), the Court simply cannot conclude that Moore cannot allege a sufficient level of personal involvement on the part of DeAngelo.  For these reasons, Moore should be allowed an opportunity to amend her Eighth Amendment claim against Defendant DeAngelo.  Accordingly, DeAngelo's motion for summary judgment should be denied without prejudice.

### 2.   *Moore's Eighth Amendment Claim Against Defendant Ozor*

In her complaint, Moore alleges that Defendant Ozor had direct involvement in denying her requests for healthcare.  Specifically, Moore alleges that it was Ozor who received her healthcare kite, indicated she would schedule Moore for a physician visit, and then failed to do so.  (Doc. #1 at ¶¶6-9).  However, the MDOC Defendants argue that, even assuming Moore's allegations are true, summary judgment is appropriate on her Eighth Amendment denial-of-medical-care claim against Ozor.  (Doc. #8 at 11-14).

Moore asserts that Defendant Ozor's failure to provide certain medical care violated her rights under the Eighth Amendment to be free from cruel and unusual punishment.  The Eighth Amendment's Cruel and Unusual Punishment Clause prohibits conduct by prison officials that involves the "unnecessary and wanton infliction of pain" upon inmates.  *Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987) (internal citations omitted).  "'Deliberate indifference' by prison officials to an inmate's serious medical needs constitutes 'unnecessary and wanton infliction of pain' in violation of the Eighth Amendment's prohibition against cruel and unusual punishment." *Miller v. Calhoun Cty.*, 408 F.3d 803, 812 (6th Cir. 2005) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).

14

The Sixth Circuit recently explained the standards that a plaintiff must satisfy to state a claim for deliberate indifference to her serious medical needs:

> A claim of deliberate indifference under the Eighth Amendment has both an objective and a subjective component. The objective component requires the existence of a sufficiently serious medical need. To satisfy the subjective component, the defendant must possess a "sufficiently culpable state of mind," rising above negligence or even gross negligence and being "tantamount to intent to punish." Put another way, "[a] prison official acts with deliberate indifference if he knows of a substantial risk to an inmate's health, yet recklessly disregards the risk by failing to take reasonable measures to abate it." Mere negligence will not suffice. Consequently, allegations of medical malpractice or negligent diagnosis and treatment generally fail to state an Eighth Amendment claim of cruel and unusual punishment.

*Broyles v. Correctional Medical Servs., Inc.*, 478 F. App'x 971, 975 (6th Cir. 2012) (internal citations omitted).

Moreover, a plaintiff must demonstrate that a prison official knew of and disregarded an excessive risk to inmate health or safety by showing that (1) the official was aware of facts from which an inference could be drawn that a substantial risk of serious harm existed, and (2) the official actually drew the inference. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). As the Sixth Circuit has recognized, the requirement that the official subjectively perceived a risk of harm and then disregarded it is "meant to prevent the constitutionalization of medical malpractice claims; thus, a plaintiff alleging deliberate indifference must show more than negligence or the misdiagnosis of an ailment." *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001). The *Comstock* court further explained:

> When a prison doctor provides treatment, albeit carelessly or inefficaciously, to a prisoner, he has not displayed a deliberate indifference to the prisoner's needs, but merely a degree of incompetence which does not rise to the level of a constitutional violation. On the other hand, a plaintiff need not show that the official acted 'for the very purpose of causing harm or with knowledge that harm will result.' Instead, 'deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk.'

15

*Id.* (internal citations omitted).

Moore's own allegations, as well as the record evidence, demonstrate that, under these standards, Defendant Ozor was not deliberately indifferent to a serious medical need.  Moore alleges in her complaint that she sent kites to prison healthcare – on August 27, 2011, September 19, 2011, and September 21, 2011 – indicating that she was suffering from pelvic and abdominal pain, and requesting an appointment with a doctor.  (Doc. #1 at ¶¶2, 4, 6).  Moore further alleges that, on September 22, 2011, she received a kite response from Defendant Ozor, indicating that she would be scheduled for a visit with a physician on approximately September 23, 2011.  (*Id.* at ¶7).  According to Ozor's sworn affidavit, Moore was *tentatively* placed on a list to see a physician on that date because "prisoners are triaged based on the level of emergent needs received."  (Doc. #8 at Ex. 3, ¶3).  Moore asserts that Ozor erred in characterizing her as a "non-emergency" patient, alleging that, as a result, she was not seen by a physician on September 23, 2011.  (Doc. #1 at ¶8; Doc. #16 at 12).  This argument fails for a number of reasons.

First, Moore concedes that, after receiving her healthcare kite, Ozor took steps to see that she was treated by a doctor.  Second, prior to kiting healthcare on the dates in question, Moore had been seen by Dr. Pei (on August 16, 2011), at which time Dr. Pei had diagnosed her with bacterial vaginitis and prescribed an antibiotic.  (Doc. #1 at ¶27; Doc. #8 at Ex. 3, ¶4).  And, finally, although Moore was not seen on September 23, 2011, as Ozor had tentatively indicated, she was treated by Dr. Pei just five days later, on September 28, 2011.[8]  (Doc. #8 at Ex. 3, ¶4).  It

---

[8] To the extent Moore is alleging that this five-day delay gives rise to a deliberate indifference claim, such an argument lacks merit.  *See, e.g.*, *Loukas v. Gundy*, 70 F. App'x 245, 247 (6th Cir. 2003) (delay of 23 days to x-ray foot, determine a minor fracture, and prescribe crutches and pain medication did not rise to deliberate indifference).  Moreover, "an inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of the delay."  *Loukas*, 70 F. App'x at 247 (citing *Napier v. Madison County, Ky.*, 238 F.3d 739, 742 (6th Cir. 2001)).  Moore has

appears that Dr. Pei did not perform a gynecological examination of Moore on this date because of an unspecified "custody reason"[9]; however, Dr. Pei's notes indicate that she saw Moore during her segregation rounds on that date.  (Doc. #8-5 at 5).  Given Moore's complaints (e.g., "vaginal discharge lately w/odor"), the fact that she had had a normal pap smear just one month earlier, and the fact that a vaginal culture performed on August 16, 2011 revealed that she had bacterial vaginitis ("BV") at that time, records indicate that Dr. Pei made the medical decision to "empirically treat vaginitis of BV now," and ordered another round of antibiotics for Moore. (*Id.*).

It is clear, then, that Defendant Ozor did not ignore Moore's requests for medical treatment; rather, she took steps to ensure that Moore was seen by medical practitioners, which resulted in her receiving various forms of treatment for her pelvic pain.  Although Moore might not have received the exact treatment she preferred, or on the exact timeline she desired, the evidence belies allegations of deliberate indifference by Defendant Ozor.  The law in this Circuit is clear that mere differences of opinion or disagreements between a prisoner and prison medical staff over the kinds of treatment a prisoner needs do not rise to the level of deliberate indifference.  *See Umbarger v. Corr. Med. Servs.*, 93 F. App'x 734, 736 (6th Cir. 2004).  Courts distinguish between "cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment."  *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011) (internal quotations omitted).  While the former

---

provided no such documentation.

[9] Moore vaguely alleges that there was a "'custom' of denying and or delaying" medical care to inmates in segregation.  (Doc. #16 at 10).  This argument fails, as Moore has not sufficiently alleged the existence of any custom or policy implemented by any of the MDOC Defendants and has not sued the MDOC itself.  *See Jones v. Martin*, 9 F. App'x 360, 361 (6th Cir. 2001).  Moreover, even if there existed such a "custom," as Moore suggests, the fact remains that she received medical treatment while in segregation, which belies such allegations.

cases may evidence the type of culpability required to state a deliberate indifference claim, the latter amount to assertions of medical negligence and do not satisfy the requisite subjective component of such claims. *Id.* Indeed, courts have recognized, "In cases where an inmate alleges deliberate indifference but the record demonstrates that the inmate received medical attention and is, in essence, filing suit because he disagrees with certain decisions made by the medical staff, the defendant is entitled to summary judgment." *Allison v. Martin*, 2009 WL 2885088, at *6 (E.D. Mich. Sept. 2, 2009) (internal citations omitted); *see also Umbarger*, 93 F. App'x at 736.

That is precisely the case here, where the allegations contained in Moore's complaint and response brief establish that her concerns about pelvic and abdominal pain were addressed, and the evidence demonstrates that she received ongoing treatment for these conditions. Defendant Ozor did not ignore Moore's concerns; rather, she took action to see that her condition was treated (albeit perhaps not as quickly or in the exact fashion that Moore would have liked). As a result, Moore cannot succeed on a deliberate indifference claim against Defendant Ozor, and her summary judgment motion should be granted. *See Alspaugh*, 643 F.3d at 169; *Allison*, 2009 WL 2885088, at *6; *Umbarger*, 93 F. App'x at 736.

### 3.   *Qualified Immunity*

Defendants also argue that because their actions were objectively reasonable under the circumstances, and because they did not violate Moore's clearly established constitutional rights, her claims are barred by the doctrine of qualified immunity. (Doc. #8 at 14-16).

Under that doctrine, governmental officials performing discretionary functions are shielded from civil liability unless their conduct violates a clearly established constitutional right. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity is premised upon the avoidance of unnecessary burdens of litigation, and therefore the privilege is an immunity from

18

suit and not a mere defense to liability.  *See Saucier v. Katz*, 533 U.S. 194, 200 (2001).

Determining the applicability of qualified immunity requires a two-step inquiry into whether the

facts, when viewed in the light most favorable to the plaintiff, would permit a reasonable juror to

find that:   (1) the defendant violated a constitutional right; and (2) the right was clearly

established.  *See Saucier*, 533 U.S. at 201.  In conducting this inquiry, the court is "permitted to

exercise [its] sound discretion in deciding which of the two prongs of the qualified immunity

analysis should be addressed first in light of the circumstances in the particular case at hand."

*Pearson v. Callahan*, 555 U.S. 223, 236 (2009); *see also Bishop v. Hackel*, 636 F.3d 757, 772

(6th Cir. 2011).

        In this case, for all of the reasons discussed above, Moore has not established that

Defendants Warren, Aiken, or Ozor violated a clearly established constitutional right.  Thus, as

to these defendants, Moore cannot satisfy either prong of the qualified immunity standard.  For

this reason too, then, Moore's claims against these defendants should be dismissed.

        However, with respect to Defendant DeAngelo, as set forth above, Moore essentially

alleges that, while she was in segregation, DeAngelo observed her "lying on the floor several

times unable to move due to pain in vagina."  (Doc. #8 at 10).  Moore further asserts that, despite

these observations, and despite the fact that she could see Moore in "extreme pain," DeAngelo

"ignored [Moore's] repeated requests for medical treatment …."  (*Id.* at 18).

        The MDOC Defendants have not argued that summary judgment is substantively

warranted on Moore's Eighth Amendment claim against DeAngelo.   And, viewing these

allegations in the light most favorable to Moore, she has made out a claim that DeAngelo's

alleged actions – in delaying or denying her necessary medical treatment, despite observing her

in pain which was so extreme that she could not move – violate Moore's Eighth Amendment

right to be free from deliberate indifference to her serious medical need.  *See, e.g., Estate of Carter v. City of Detroit*, 408 F.3d 304, 310, 312-13 (6th Cir. 2005) (holding that a defendant who knew the plaintiff was exhibiting "the classic symptoms of a heart attack" and did not arrange transportation to a hospital could be found deliberately indifferent).  This right was clearly established at the time of DeAngelo's alleged violation.  *See Fitzke v. Shappell*, 468 F.2d 1072, 1076 (6th Cir. 1972) (holding that "where the circumstances are clearly sufficient to indicate the need of medical attention for injury or illness, the denial of such aid constitutes the deprivation of constitutional due process").  Accordingly, based on the present record, Defendant DeAngelo is not entitled to qualified immunity as a matter of law.

## III.     CONCLUSION

For the reasons set forth above, **IT IS RECOMMENDED** that the MDOC Defendants' Motion for Summary Judgment [8] be **GRANTED** as to Defendants Warren, Ozor, and Aiken and **DENIED WITHOUT PREJUDICE** as to Defendant DeAngelo.   Further, **IT IS ORDERED** that Moore shall have until the later of thirty (30) days from today's date, or, if Defendant DeAngelo files a timely objection to this Report & Recommendation which is denied by the district court, twenty-one (21) days after that denial, to file an amended complaint adding the allegations regarding Defendant DeAngelo's personal involvement, as articulated in Moore's response brief (*see supra* at 12-13).


Dated: October 9, 2013                           s/David R. Grand
Ann Arbor, Michigan                          DAVID R. GRAND
                                                         United States Magistrate Judge


## <u>NOTICE TO THE PARTIES REGARDING OBJECTIONS</u>

Within 14 days after being served with a copy of this Report and Recommendation and Order, any party may serve and file specific written objections to the proposed findings and

recommendations and the order set forth above. *See* 28 U.S.C. §636(b)(1); Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d)(1).  Failure to timely file objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140, (1985); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005).  Only specific objections to this Report and Recommendation will be preserved for the Court's appellate review; raising some objections but not others will not preserve all objections a party may have. *See Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987); *see also Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006).  Copies of any objections must be served upon the Magistrate Judge. *See* E.D. Mich. LR 72.1(d)(2).

A party may respond to another party's objections within 14 days after being served with a copy. *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. §636(b)(1).  Any such response should be concise, and should address specifically, and in the same order raised, each issue presented in the objections.

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on October 9, 2013.

s/Felicia M. Moses
FELICIA M. MOSES
Case Manager